HICKEY CAPPS AND CLARENCE CAPPS v. THE STATE.

No. 21568. Delivered April 30, 1941.
Rehearing Denied June 11, 1941.

The opinion states the case.

*E. J. Conn* and *Tom F. Coleman, Sr.,* both of Lufkin, for appellants.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State, on submission.

GRAVES, Judge.

Appellants were jointly indicted and jointly tried for an assault to murder upon I. L. Hannah, and were by the jury convicted and given a term of two years each in the penitentiary.

The facts as adduced by the State were as follows: Mr. Hannah, a man fifty-seven years of age, lived by himself on his farm of about 60 acres. On this farm was another house, which Mr. Hannah rented out. He had previously rented such house to Melvin Capps, a brother of the appellants, and had had some trouble relative to a collection of the rent. Finally he had employed an attorney and ousted Melvin Capps from said house. On the night of the alleged assault these two appellants had been to a dance near Lufkin, and about 12 o'clock at night, in company with a girl, Ruby Pearson, who afterwards

married Clarence Capps, one of the appellants, they started towards the home of appellants' father, the road they traversed being one that led to their father's home but was not the most direct route. After they had passed the town of Huntington, driving in Clarence Capps' truck, with Hickey Capps driving, they had also passed Mr. Hannah's home, and when they were about one hundred yards beyond the same, Hickey Capps said he was going back and give Mr. Hannah a drink of whisky, according to appellants' statements. In any event, Mr. Hannah testified that he was asleep and we quote:

"Somebody came in my house that night after I went to bed; Hickey Capps and Clarence Capps came in there, and I was in bed and Hickey jumped on me and says, 'Oh, yes, God damn you; I have got you and I am going to kill you.' I was in bed at that time and had gone to sleep. I asked him what he was going to kill me for, and he says, 'The way you done my brother.' And the next thing, when I came to myself, he grabbed my throat and commenced to beat me; and the next thing I knew, it seems like I was in the east yard there, between the porch and the east gate, and he got off of me and kicked me in the side, and that is all I know. Hickey Capps did that, and Clarence was on that side towards the foot of the bed when Hickey jumped on me. I didn't see them when they came in the house. I don't know how long the defendants beat me there. After I had come to myself out there in the yard, as to how long it was then until I knew what was happening after that, I will state that I just remember him getting off of me and kicking me in the side, and that is all I remember."

A neighbor, Bennie Quarles, who lived right across the road from Mr. Hannah, had also been to Lufkin the night of the trouble. He got home about 12 or 1 o'clock. He came with a friend who lived about one mile below the witness. When witness got out of the car in front of his house there was a truck parked in front of Hannah's house. Soon after the witness got out of the car he heard a disturbance and cursing at Hannah's house, and recognized the voice of Hickey Capps. The witness then went down the road to Mr. Berry's and requested to be taken back to Huntington in order to obtain an officer to go to Mr. Hannah's relative to this disturbance. He found Mr. Conner, the constable of that precinct, at his home in bed. This was about 1 o'clock. Mr. Conner arose from bed, dressed and went by where Mr. Kimmey, the night watchman was, and they both then drove to Mr. Hannah's, a distance of

about two miles, arriving there about 1:20 o'clock. Upon their arrival at Hannah's they found Clarence Capps and the girl Ruby sitting in the truck, and the officers ordered Clarence under arrest. They searched him and the truck and found an empty whisky bottle therein; another whisky bottle was found in the yard, and a pistol also. We further quote from Mr. Conner's testimony:

"I started to ask Clarence who was in the house and what the trouble was, and Clarence said Hickey was in there beating 'hell out of old man Hannah;' and I started and Clarence followed me between Mr. Kimmey and myself. I got there as soon as I could, and so I went on to the house a short ways—twenty-five steps from the truck to the porch—and when I got to the porch leading to the door facing the road and inside was the bed, and I threw the light in there, when I jumped on the porch, and Mr. Hannah I believe was sitting on the side of the bed and Hickey had one hand on his shoulders and didn't pay much attention to them and I hollered at him. Hickey struck at the old man a lick or two and I threw my light on him and told him to get up from there, and he turned around towards me and asked, 'Who in hell are you?' and I told him. That was Hickey Capps said that. I told him who I was, and to consider himself under arrest. Clarence Capps followed me in there, and on the way there he said, 'Charlie, I feel like you ought to let him alone and let him finish the old son-of-a-bitch.' I told Mr. Kimmey to search him and he did, and he took a small knife out of his pocket and handed it to me. He took the knife out of Hickey Capps' pocket. I think I would know that knife if I saw it; that is the same knife. Mr. Hannah is the one that hollered at me and said, 'Charlie, they are beating me to death.' The defendants, Hickey Capps and Clarence Capps were there."

Again he testified:

"I also went back there to Mr. Hannah's house the next morning and made an examination of the bed clothes, and the quilts or covers was scattered around and the pillow casing was bloody. I don't know where those bed clothes are now. From my examination of the bed and bed clothes it appeared that there had been a scuffle on and about that bed.

"Cross Examination—By Conn.

"I found this bottle in the cab of the truck; it was empty like it is now. The cab only has one seat and it was in the seat;

I believe it was lying between the girl and Clarence and in the seat. I found this bottle in the yard * * * I found this in the yard at Mr. Hannah's house, about that far from the edge of the porch. I found this gun in the yard as far from the gallery I guess as from here to that wall, possibly. Hickey Capps, the defendant, informed me where the gun was. He said he threw the gun that way. He did not say that the old man tried to shoot him with it. He told me it was not his gun. Kimmey took the knife out of his pocket and handed it to me."

Dr. A. E. Sweatland testified, among other things, that:

"I know I. L. Hannah. I had occasion to treat him along about the 21st of September of this year, and thereafter. I first saw him in the Angelina County Hospital; I can't say now what time of day or night it was. He was in the hospital some couple of weeks, I think, and then I saw him later at Keltys at one of his relatives. When I first saw him in the hospital I then made an examination of him. As to what I found him suffering with, I believe he had some broken ribs and his chest was injured and his face was bruised, and he was cut around one eye, especially, that was bad; he was suffering from that. The treatment that I administered was rest and strapping his side and the usual treatment for bruises. As to which side his ribs were broken on, you know those things are made of record and I wouldn't swear which side. I think there were three ribs broken. As to the condition of his face when I first saw him, it was bruised, and especially over one eye."

Appellants' bill of exceptions No. 1 complains of the trial court overruling his application for a continuance in order to obtain the testimony of Lilly Capps, who it was alleged was present during this difficulty, and was an eye witness thereof. Appellants seemed to have misconstrued the effect of their own testimony in that it is shown by their own testimony, as well as that of their witness Ruby Pearson, later Ruby Capps, that she was the woman present in the truck, and no other woman was thus present. Ruby Pearson Capps testified fully relative to such matters, while Lilly Capps was doubtless safe at home. The trial court qualifies this bill as follows:

"All witnesses including the defendants themselves testified that Lilly Capps was not present and saw no part of the difficulty." Any further testimony expected from her was given by her husband, and does not seem to have been of a material character. See Art. 543, C. C. P. We overrule this bill.

Bill of exceptions No. 2 relates to an argument by the district attorney in which he stated that certain witnesses who had washed Mr. Hannah's bed clothes were present in the court room during part of the trial, but on account of their having violated the rule he did not place them on the stand. While this argument should not have been made, we think it was invited by the following statement theretofore made by appellants' attorney when the following occurrence happened as shown by the bill:

"In the course of argument one of the defendants' attorneys, Tom F. Coleman, asked why the sheets were not produced, if in fact they were blood stained, as claimed by the state."

It was contended by the State, as set forth in Mr. Hannah's and Mr. Conner's testimony, that a portion of the fight occurred in the house, the appellants contending that all the fighting occurred in the yard. We think the statement above complained of was invited by and in answer to the question, a part of appellants' attorney's argument, and if error, then same was by invitation of the last quoted statement. That there was some blood lost in this forty-five minute battle there is no doubt, and such was shown in the evidence, and we are not impressed with the seriousness of this exchange between the two attorneys. This bill is overruled.

There are no further bills in the record. The sufficiency of the testimony is challenged, and especially that referring to Clarence Capps.

It is to be noted that the appellants at midnight drove, in Clarence Capps' truck, by Mr. Hannah's home, on their long way home, and then turned around and came back to give Mr. Hannah a drink, they say, of whisky or brandy or wine, with which purpose the jury evidently differed with them; that they awakened Hannah, Hickey cursing him, and Clarence standing near by when the assault began, and heard Hickey threaten to kill Hannah, the assault continuing for a period of about forty-five minutes, with Clarence present all the time, either in the house or in the truck in front of the house; while Quarles walked to Berry's home, nearly a mile, got in a car and drove two and one-half miles to Huntington, roused the constable, who dressed, obtained the company of a friend, and drove two miles to Hannah's home and found Hickey beating on Hannah, and unwilling to stop, the officer being requested by Clarence, who

had followed him into the house of Hannah, "Charlie, I feel like you ought to let him alone, and let him finish the old son-of-a-bitch." When the officer first came on the scene he asked Clarence who was in the house, and Clarence replied that "Hickey was in there beating hell out of old man Hannah."

The careful trial court instructed the jury on the law governing an assault with intent to murder both with and without malice, also gave a full charge on the law of principals, setting forth the doctrine of acting together, and instructing the jury in paragraphs fifteen and sixteen thereof as follows:

"(15) When an offense is actually committed by one or more persons, but others are present, and knowing the unlawful intent, aid by acts or encourage by words or gestures, those actually engaged in the commission of the unlawful act, or who, not being actually present, keep watch so as to prevent the interruption of those engaged in committing the offense, such persons so aiding, encouraging or keeping watch are principal offenders.

"(16) Where an offense has been committed, a true criterion for determining who are principals is: Were the parties present at the time and place of the commission of the offense; did the parties act together in the commission of the offense; was the act committed in the pursuance of a common intent and in pursuance of a previously formed design, in which the minds of all parties united and concurred. If so, the law is that all are equally guilty, provided the offense was actually committed during the existence and in execution of the common design and intent of all."

He also told them that mere presence at such scene would not suffice to make such a person a principal, but that unless a previous agreement was shown, in order to find such person guilty, they had to be convinced beyond a reasonable doubt that such person participated in the commission of such offense in some of the above modes set forth in the charge. He also instructed them on the law of aggravated assault and simple assault, and self-defense, and defense of another.

Under the charge of the court as above outlined, we think the jury was justified in believing that appellants went to this home of Mr. Hannah, and, upon his awakening, both appellants standing by his bed, one of them announced the intent and pur-

pose of the visit; then the continued beating. While the jury could have concluded that Clarence retired to the truck and kept watch, and even requested the peace officer, upon his arrival, to allow the beating to continue until the other appellant had finished Mr. Hannah, as well as the continued vicious attack upon Hannah after the officers' arrival, seems to us to be sufficient to allow the jury to conclude that these two appellants were acting together on a previously formed design to do that which they did, and that Clarence not only entered into this design but was also keeping watch so that his brother could finish the job. This was evidently what the jury decided from the facts, and we do not feel like disturbing their finding.

We find no error in the record, and the judgment is therefore affirmed.

### ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

One ground of appellants' motion for rehearing is predicated on the trial court's refusal to give a special requested charge. The charge sought was to the effect that if appellants went to the home of Hannah to give him a drink of liquor, and Hannah assaulted them they would have a right to defend against such assault. The trial court did instruct the jury, in substance, if they believed or entertained a reasonable doubt, that Hannah made an attack on appellants or either of them, or it reasonably appeared that he was about to attack them or either of them, and that it caused them or either of them to reasonably apprehend "bodily injury," and they assaulted Hannah under such circumstances, to find them not guilty. It is apparent that the court gave appellants the full right of self defense without limitations or restrictions, regardless of their purpose in being at Hannah's house. The complaint based on the court's refusal of the special charge seems without merit in view of the instruction given.

It is again urged that the evidence does not support the conviction of appellants, and especially so as it relates to Clarence Capps. We were at some pains to set out in our original opinion somewhat in detail the evidence. A repetition thereof would serve no useful purpose. We have, however, again examined the statement of facts, and supplement what is found in our original opinion with the further observation that as a result of the injuries sustained Mr. Hannah remained in the hospital five days and was confined to his bed for about four weeks.

The trial judge seems to have submitted to the jury every issue in the case. He more than once instructed them that appellants could not be convicted of assault with intent to murder unless they entertained the specific intent to kill Mr. Hannah. The jury were also told if they had a reasonable doubt as to whether appellants intended to kill Hannah they should be acquitted of assault with intent to murder, and then consider whether appellants were guilty of an aggravated or simple assault.

While the case is unusual in some respects, after all, it resolves itself into the simple proposition of whether this court may substitute its judgment for that of the jury on an issue of fact. If there is an absence of evidence on an issue we may with propriety say so, but the verdict should not be disturbed if it finds support in the evidence. Applying that rule here, our inteference with the verdict and judgment would be unauthorized.

The motion for rehearing is overruled.